IN THE MATTER OF HAROLD KRIEGER AND MORRIS BRAUER, ATTORNEYS-AT-LAW OF NEW JERSEY.

Argued September 27, 1966—Decided November 21, 1966.

*Mr. John J. Bergin* for the order.

*Mr. Robert B. Meyner* argued the cause for respondent Krieger (*Messrs. Samuel A. Larner* and *William P. Verdon,* of counsel; *Messrs. Meyner & Wiley,* attorneys).

*Mr. Walter D. Van Riper* argued the cause for respondent Brauer (*Messrs. Van Riper & Belmont,* attorneys).

The opinion of the court was delivered

PER CURIAM. These are disciplinary matters. Respondents, Harold Krieger and Morris Brauer, are charged with unethical conduct with respect to the theft of a file from a court-appointed officer and the preparation and submission to a trial court of a forged paper prepared from material in the stolen file. The conduct related to a civil suit to which we will presently refer. Krieger is separately charged with initiating a criminal prosecution against a witness for the purpose of achieving a favorable result in that civil action. Brauer is charged separately with seeking to induce a member of the Bar to transmit a corrupt proposal to the Prosecutor of Essex County, which conduct is not related to the civil suit above mentioned.

The charges were referred to Judge Giuliano as a master for trial. Following his report, we issued the orders to show cause now before us.

I

The civil action mentioned above involved the ownership of a corporation. Krieger represented the plaintiff, Gershon Shugar, while Jerome C. Eisenberg represented defendants David Perlstein and Wilbur Perlstein. Shugar and David Perlstein are married to sisters of respondent Brauer. Shugar and David Perlstein each held of record 50% of the stock of the corporation, but Wilbur Perlstein claimed he was entitled to a one-third interest and he was supported in that claim by his brother, David. Although not counsel of record in that case, Brauer worked actively with Krieger in the interest of Shugar.

The parties continued to run the corporate business during the litigation despite the ferocity with which it was waged, but being unable to agree upon operational decisions, they stipulated that John Drewen, a retired judge of the County Court, should arbitrate disputes in that area. Later Judge Drewen was appointed to that role by the trial court and he served until relieved at his own request on May 8, 1964.

The trial of the civil suit, which consumed 19 days, ended on September 21, 1964. Judge Matthews, the trial judge, filed his opinion in favor of Wilbur Perlstein on June 2, 1965. One week later Judge Drewen's secretary discovered his files with respect to that matter had been stolen. On June 16 Judge Drewen advised Judge Matthews of that fact.

Krieger received four envelopes through the mail, three postmarked respectively June 14, 19, 24, 1965, and the last apparently also postmarked in the same month. The enclosures therein purported to be reproductions of letters from Eisenberg to Judge Drewen and from Eisenberg and Judge Drewen to Mortimer C. Low, the accountant for the corporation.

The letters reproduced and transmitted in the first three envelopes were innocuous. Krieger brought one or more of them to Judge Matthews. The fourth envelope contained eight reproductions, one of which, purportedly written by Eisenberg to Judge Drewen under date May 20, 1965 and marked "Confidential," reads:

"Recently, it was necessary for me to tell David Perlstein, and reassure him three times, that he should not be impatient; that Judge Matthews informed me that the factual decision would be released in early June, a complete victory on all our issues. When our depraved friend down your hall receives it, he will have reason to then fulminate.

Assuring you of our appreciation for your untiring efforts throughout the entire proceedings, I know a call from you to David would instill the patience he now requires."

When Krieger brought the last batch to Judge Matthews on July 2, 1965, Judge Matthews summoned Eisenberg and

then informed all counsel of the theft of Judge Drewen's file. Eisenberg was shown the letter quoted above and he immediately denounced it as a fraud. Judge Matthews telephoned the Chief Justice who directed that all the exhibits be impounded, subject to access by experts designated by any of the parties, and that the matter be referred to the Attorney General for investigation.

Eisenberg and Krieger each had the questioned letter examined by an expert of his own selection. Eisenberg testified his expert found it to be a forgery, the quoted portion of the letter being a fabrication placed upon an old letterhead and then photographed. We are told by counsel for Krieger that his expert was unable to say whether the document was fabricated. We cannot understand how an expert could be in doubt if he was shown all of the exhibits. As Eisenberg's expert noted, the signature "Jerry" on the disputed document coincides precisely with the signature on a genuine letter from Eisenberg to Judge Drewen, dated October 25, 1963, a reproduction of which was contained in the same envelope in which the disputed document was transmitted to Krieger, thus showing that the genuine signature on the October 1963 letter was either itself used or was traced in preparing the fabricated letter. The fact of forgery is thus indisputable, and hence we need not relate the additional proof which would independently require that same finding.

The New Jersey State Police conducted the investigation. It developed that one of the four envelopes mailed to Krieger was addressed on a typewriter in his office and that one of the reproductions was made on a Xerox machine in his office. However, neither the forged letter nor the envelope in which it came was traced to Krieger's office or to the other places inspected, which included the offices of Eisenberg, Brauer and Shugar.

Confronted with the fact that his office equipment was involved, Krieger, according to Detective Pagano, seemed genuinely surprised and blurted "Morris Brauer." We note that Judge Drewen, Krieger, and Brauer had their offices in the

same building. Krieger produced an employee who said that Brauer used his Xerox machine in June of 1965. This Brauer denied. Krieger offered evidence that Shugar had used the Xerox machine and this Shugar testified was true. Finally, Krieger offered testimony that he "passed" a lie-detector test conducted by the State Police. The other men mentioned, Brauer, Shugar, and Eisenberg, had also submitted to such tests voluntarily.

Brauer offered no evidence beyond his own denial of complicity or knowledge.

Judge Giuliano found in favor of the respondents with respect to the theft, the forgery, and the use of a known forgery. We nonetheless issued our orders to show cause.

## A

We interrupt the discussion of the merits to comment upon the contention pressed by Krieger in his brief that the procedure here used did not afford him due process.

In this regard, Krieger notes that the order of reference provided that Judge Giuliano "shall act as an Ethics Committee and shall have all the powers conferred upon such a Committee by Rule 1:16." The point he makes is that under Rule 1:16-4, a member of an ethics committee first conducts an *ex parte* "preliminary investigation," and thereafter the committee decides, upon a consideration of the report of the investigator, whether to close the matter (subject of course to our ultimate review) or to set it down for final hearing. Here the preliminary investigation was had before the reference was made to Judge Giuliano. The investigation was made by the State Police, and upon its report we decided that a formal hearing was warranted. There was no reason to ask a member of an ethics committee, or someone designated by Judge Giuliano, to duplicate the investigation already made and considered by us. Thus there was no departure from the essentials of the procedure an ethics committee would follow. Rather, having decided that the matter was

one to be investigated by a law enforcement agency and then tried before a judge, we followed steps equaling the regular ethics procedure.

The order of reference to Judge Giuliano was made on January 12, 1966. The first date of hearing, fixed by Judge Giuliano, was Monday, February 14. By letter to the Clerk of our Court dated February 8, counsel for Krieger said he assumed the most that could emerge from the hearing before Judge Giuliano would be specific charges to be heard at a later date. By letter dated February 15, the Clerk informed counsel that "this will be the final hearing in the matter and that if you feel the charges are not sufficiently specific you should ask for a bill of particulars from your adversary." This letter was received by counsel while the hearing before Judge Giuliano was in progress and counsel noted his receipt in the transcript.

The order of reference designated Judge Giuliano "a Master of this Court for the purpose of conducting an investigation and hearing to *determine:* (1) whether Harold Krieger and Morris Brauer, attorneys at law of this State, or either of them, are *guilty* of unethical and unprofessional conduct in connection (a) with the alleged theft of a file from the office of John Drewen, also an attorney at law of this State, and (b) with the alleged preparation and submission to Superior Court Judge Robert A. Matthews of an apparently forged paper." We have underscored the words "determine" and "guilty" which we would think should have advised Krieger that the hearing was not a mere preliminary inquiry. And of course it was not appropriate to seek to resolve a doubt in that regard by the medium of a letter to the Clerk of the Court written so close to the date set for hearing.

██ Upon our inquiry at the oral argument we were told that respondent was entitled to more detail as to precisely how he was connected with the theft and the preparation of the forgery. We do not understand why a member of the Bar would need a specification of that kind. The range of the charges was quite limited. A lawyer would be guilty of un-

ethical conduct if (1) he stole or conspired for the theft of the file; or (2) prepared or conspired for the preparation of the forged paper; or (3) knowing the paper to be forged, submitted it to the court as genuine or possibly genuine. All of this was clearly implicit, and we see no reason why the prosecution had to choose in advance from among those theses.

Nor could an omission so to choose place an unfair burden on the defense either as to preparation or as to trial. The fact is that the matter was tried fully by Krieger as to all of the facets we have just listed. We asked his counsel what more he would have done, either by way of preparation or at trial, and he stated frankly that he could think of nothing except that perhaps he would have had an expert examine the envelope and the reproduction tied into Krieger's office. But the opportunity thus to deal with all exhibits was assured when they were first impounded, and in fact counsel for Krieger tells us that Krieger had the disputed letter examined by an expert. Further, at the argument we offered him a fresh opportunity for such examination or to reopen the hearing for further examination, direct or cross, and invited counsel to advise us seasonably if that opportunity were wanted. No such request has been made.

Accordingly we see no substance to the claim that procedural due process was denied. We return to a consideration of the merits.

B

There can be no doubt that Shugar or someone allied with him is guilty. The impulse could not reasonably be thought to have come from any other source. As to Krieger, the fact is that equipment in his office was used to prepare two of the exhibits in the case—the envelope postmarked June 24 and a Xerox reproduction of a letter transmitted in one of the envelopes. The inculpatory thrust of that circumstance is strong. To it may be added the fact that Krieger made no inquiry of Judge Drewen notwithstanding that the reproductions of original letters addressed to Judge Drewen were

194

likely prepared from his file. As to this, Krieger says he assumed someone in Eisenberg's office prepared the copies before the originals were mailed, but that hypothesis would not explain a reproduction of a letter from Judge Drewen to Low (undoubtedly surreptitiously taken from Low), and in any event, a call from Krieger to Eisenberg would seem in order if Krieger, as he professes, was mystified by it all. Finally, although of course the mere fact that Krieger represented Shugar would not be inculpatory in the least, the unfortunate fact is that Krieger did share the animosity of his client, as is evident from Krieger's behavior with respect to the second charge against him, discussed hereinafter.

Krieger offered no evidence to explain the direct proof against him. He went no further than to point a finger of suspicion at Brauer and Shugar by offering testimony that each of them had used the Xerox machine. But why would the culprits, whoever they are, covertly use Krieger's equipment? It is plain that other equipment was available to them both before and after Krieger's machines were used. This is so because the envelope typed in Krieger's office was postmarked June 24 and thus was the third in the series of mailings, and all the reproductions, except one, were made on other machines. Other equipment being at hand, it would seem to follow that in using Krieger's equipment the culprits deliberately created evidence against him. If evidence was thus planted against Krieger, the probable reason would be either that Krieger was involved and his confederates wanted to be sure he would not extricate himself alone if the plan failed, or that Krieger, although not involved in the theft or the forgery, knew who was and hence the planted evidence would serve to silence him.

The first hypothesis would presuppose Krieger's guilt and thus not help him, while the second hypothesis would assume his innocence of the specific charges here involved. The second hypothesis is consistent with the proof. It could be that Krieger was surprised to learn that he had been duped into transmitting a forgery to Judge Matthews. As we have said,

Krieger did seek the opinion of an expert as to whether the exhibit was genuine despite Eisenberg's denunciation of it, and if we assume that engaging an expert was not merely theatrical, it would indicate that Krieger really believed the letter was authentic. And Krieger's exclamation, "Morris Brauer," when Detective Pagano confronted him with the fact that his equipment was used, suggests Krieger knew more than he was willing to tell.

Krieger of course does not project the second hypothesis we have just discussed. Nor could he safely, since although it would relieve him of the specific charges of complicity in the theft, forgery, and use of a known forgery, it would leave him accountable upon another score. We have pursued this possible view of the evidence only in our search for some rational explanation, if one may venture to deal rationally with this picture, consistent with Krieger's innocence of the specific charge here involved. The thesis we have just described seems to be the only likely one, although, as we have said, it would leave Krieger tainted in another respect.

Judge Giuliano decided he could not conclude the evidence established Krieger's guilt of the charge here involved. Since he had the advantage of seeing the witnesses, we are not inclined to hold the other way. Hence we will accept the proposition that doubt exists as to Krieger's guilt and dismiss the order to show cause on that basis, but, we are obliged to add, this does not mean that we are completely satisfied of his innocence. We are not. On the contrary, he remains in the shadows of this brazen affair.

With respect to Brauer, the record cannot support a finding of guilt as to this charge.

## II

The second charge against Krieger arises out of a criminal prosecution he initiated against Mortimer C. Low, the accountant for the business described above. The allegation against Low was false swearing based upon an alleged incon-

sistency between testimony in a pretrial deposition and testimony at the trial.

The deposition was taken on May 14, 1964. Low testified before Judge Matthews on September 21, 1964, the last day of the trial. On September 23, 1964 Krieger wrote a letter to the Prosecutor of Hudson County, bringing the matter to his attention. The letter was brief, and enclosed were the portions of the transcripts of the deposition and trial which supposedly contained the conflicting testimony. On October 5 the matter was presented to the grand jury, and an indictment was thereafter returned. As mentioned above, the trial judge had reserved decision, and the case was decided the following June. The indictment was dismissed on motion in July, on the ground that there was in fact no conflict in Low's testimony.

Judge Giuliano's report reads:

"The Court concludes from all the evidence that Harold Krieger assisted, cooperated and participated in a criminal proceeding against Mortimer C. Low in order to obtain an advantage in the court action entitled Shugar v. Perlstein, et al, which was still pending and awaiting the decision of Judge Robert A. Matthews. This conduct on the part of Harold Krieger is in violation of Canons 15 and 18 of Canons of Professional Ethics."

As already stated, the indictment was dismissed because there was no conflict in the testimony. Judge Giuliano made the same evaluation of the record, and we agree with it. In brief, the situation was this: The subject of Low's testimony was the formation of another corporation in which all three of the litigants had an equal interest. Low had submitted an unsworn statement to Internal Revenue Service setting forth the reasons for that incorporation. In his deposition, Low testified as to what he had told Internal Revenue, but he did not make a fresh assertion in the deposition as to the truth of that statement. At the trial he said that a reason contained in that statement to Internal Revenue was not a reason for the incorporation. Thus his trial testimony departed, not from his deposition, but from the statement to Internal Rev-

enue. However, Krieger asked Low, "So that your testimony in depositions was not true, is that correct?" and Low erroneously agreed with that erroneous appraisal. The testimony as set forth in the indictment created a semblance of inconsistency but only because an excerpt from the deposition was taken out of context, thereby obscuring the fact that Low was merely relating the content of the statement to the revenue service.

Thus there was no basis for the criminal charge. At most, the situation was fuzzy because of the manner in which the examination at the deposition was conducted, and the fuzziness was such as to bar a charge of crime. *State v. Browne*, 43 *N. J.* 321, 323 (1964). Krieger having been a magistrate in Jersey City for some years, one would expect him to be perceptive in such matters. He insists however that there was a conflict between the trial testimony and the deposition. Perhaps he thought so because he was too involved in his client's emotions to think clearly. In any event we cannot reject Krieger's assertion of his belief, although, as we have said, we think it was groundless.

 Believing that Low had given false testimony, Krieger says he felt a burden to do something about it because of this sentence in *Canon* 29:

"The counsel upon the trial of a cause in which perjury has been committed owe it to the profession and to the public to bring the matter to the knowledge of the prosecuting authorities."

If this provision applied, it would not apply to Krieger alone, for it is not limited to perjury of a witness adduced by one's adversary. Thus Krieger should not have supposed he alone was singled out for action. In any event, this provision could hardly be understood to apply to a contradiction made in open court. In such a situation it would lie with the judge to refer the matter for prosecution if the public interest so required, and a lawyer (situated either as was Krieger or Eisenberg) who did nothing in the face of the judge's inaction would not be guilty of unethical conduct.

Here Judge Matthews was not moved to refer the matter to the Prosecutor. Judge Matthews did not see an inconsistency between the trial testimony and the deposition, and in any event deemed the conflict with the statement to Internal Revenue to be trivial at least so far as it related to the case before him. Krieger nonetheless says he felt a professional compulsion to act, and went to see Judge Matthews, not however for advice or instruction, but merely to tell Judge Matthews that he was going to turn the matter over to the Prosecutor. Judge Matthews, understanding that Krieger sought no instruction, nonetheless tried to dissuade him from his course. He made it plain to Krieger that he thought a criminal charge was unwarranted, cautioning him in the vein that "You do what you want, but be careful" or "Don't do something you will be sorry for." Despite this, Krieger went his intended way.

Under these circumstances we cannot credit Krieger's claim that he alerted the Prosecutor because he felt honor-bound to do so. We are satisfied and agree with Judge Giuliano that Krieger invoked the criminal process in the hope that an indictment of Low, a key witness, would make it difficult for Judge Matthews to rely upon Low's testimony in deciding the civil case.

What happened thereafter is a bit of a mystery, but Low was indicted with remarkable dispatch. Krieger says he did no more than dictate a letter to the County Prosecutor, and denied he talked with the Prosecutor at all. An examination of the letter and envelope shows they were hand-delivered, but no one could say by whom. The letter being rather cryptic, as we have said, it is inconceivable that no conversations accompanied it. The Prosecutor originally thought Krieger discussed the matter with him but before Judge Giuliano the Proecutor could not be sure. We know from Judge Matthews and the Prosecutor that the Prosecutor personally visited Judge Matthews to inquire as to whether Krieger's letter and the transcripts accompanying it were *factually* correct, and of course Judge Matthews told him they were, adding, "this is a family affair." Someone

printed on the envelope received from Krieger the notations "Special" and "False swearing." A written direction was given to the assignment clerk on the Prosecutor's staff that "This is an added matter for G. J. on 10/5/64." The matter was presented on that date, thereby receiving priority over some 412 cases then awaiting presentation to the grand jury. The explanation offered is the ease with which it could be handled, *i. e.*, the testimony of two court stenographers.

After the indictment was dismissed, someone requested the Prosecutor to take an appeal. The Prosecutor declined so to do. When he talked with Detective Pagano, the Prosecutor said it was Krieger who made that request, but before Judge Giuliano he could not recall who it was. Judge Giuliano felt compelled to comment that the Prosecutor "was evasive and uncooperative and was of no assistance to the Court in ascertaining what had transpired between himself and Harold Krieger relating to the matter of Mortimer C. Low."

We have no doubt that Krieger, who, as we have said, was formerly a magistrate in Jersey City, used his local influence to have this matter presented quickly, to the end that Judge Matthews, who then had the main case under advisement, would be faced with the problem of accepting Low's testimony while Low was under indictment for false swearing. We accordingly agree with the finding of Judge Giuliano that Krieger is guilty of unethical conduct. An order will be entered suspending him from the practice of law for a period of three months.

## III

The separate charge against Brauer involves a solicitation of Harold Teltser to transmit a corrupt proposal to Brendan T. Byrne, Prosecutor of Essex County. Teltser is a partner of Byrne in private practice. Judge Giuliano found the charge was true. The testimony clearly requires that conclusion.

Teltser represented Edward Rabin who sought a loan from Julius Steinberg, a client of Brauer. Teltser had never met Brauer. Teltser testified that in their telephone conversations with respect to their clients' transaction, Brauer several times asked to meet Teltser alone. Teltser had no idea of Brauer's purpose, and assuming that it related to the loan transaction, he informed Rabin of Brauer's request for a private meeting. Several appointments to that end were canceled for one reason or another. Teltser and Brauer finally met with their clients at Steinberg's home, where papers Teltser had prepared were discussed.

This is Teltser's version of what happened: During the meeting, Brauer asked to see Teltser alone, and they entered another room. Brauer asked Teltser if he talked with Brendan Byrne, to which Teltser replied that of course he did. Brauer then asked what the trouble was with Byrne, and whether Byrne did not like money. Brauer said he represented interests that wanted to run a plush dice game in Essex County, that the Attorney General and the local police were taken care of, and Byrne was the sole obstacle. Teltser was stunned by the proposal, and told Brauer that Byrne was unapproachable. Brauer persisted in asking that Teltser transit the message to Byrne, and Teltser, not known how else to end the unpleasant conversation and fearful that if he were blunt, Brauer in resentment might spoil the transaction the clients were still negotiating, said he would convey Brauer's message to Byrne. Teltser had no such intention, and was not at the moment certain whether he would report the incident to Byrne, but on reflection decided he should, and he did. Byrne notified the Attorney General who in turn informed the Court. We add that since Teltser had told Rabin before the meeting that Brauer had sought to meet privately with him, he told Rabin, after the meeting at Steinberg's, that the conversation with Brauer did not concern the transaction between Rabin and Steinberg. Rabin so testified.

Brauer admitted that he talked with Teltser about meeting alone prior to the night in question but said his purpose was only to learn more about Rabin and the soundness of the loan his client was to make. He denied, however, that he initiated the calls, saying it was Teltser who called to press the deal to a conclusion. At any rate, they met for the first time with their clients at Steinberg's home. Brauer says that when the clients began to discuss the rate of interest, he suggested that he and Teltser leave, because he thought neither of them should be burdened with the clients' understanding on that subject. He says that as they entered another room, he told Teltser he knew Madeline Christianson, who is the mother-in-law of Teltser's brother; that he mentioned that Mrs. Christianson was unhappy about the way Byrne had handled a matter for her, and said that she thought Byrne's conduct was unethical, whereupon Teltser responded with a spirited defense of Byrne's character, in the course of which Teltser said that Byrne, among other things, had spurned efforts by gambling interests to bribe him. This, said Brauer, was the sole reference to gambling and bribery.

Teltser denied that there was any reference to any grievance allegedly held by Mrs. Christianson, and says that Brauer mentioned Mrs. Christianson only when he and Brauer were introduced at the Steinberg home and then only casually and in pleasant terms.

Judge Giuliano summed up his findings this way:

"In weighing the testimony of Morris Brauer, this Court finds it difficult to believe his version of the events which took place in the den on the evening of October 19, 1965. The Court was not impressed with the witness, Morris Brauer. His testimony lacked candor and was wholly improbable and unbelievable.

Harold Teltser is a highly regarded and well respected member of the Bar since 1952. His attitude and demeanor as a witness strikes this Court as being one of complete candor and fairness, and his testimony is credible beyond question. It is apparent to this Court that while he disliked his role, he knew his obligations as an attorney. His account of the conversation in the den was lucid, coherent and truthful. He was not confused as contended by Morris Brauer. This

Court further concludes from the evidence that Harold Teltser believed Morris Brauer's proposal to be serious and not in jest.

On the other hand, this Court finds that Morris Brauer's version of the conversation in the light of human experience did not have the same qualities. It would be incredible that an attorney upon meeting a brother attorney for the first time would indirectly accuse his firm of 'fishy or unethical dealings.'

Morris Brauer's testimony of Harold Teltser's impassioned defense of Brendan T. Byrne's integrity borders on a *non sequitur*. Harold Teltser's account that Mrs. Christianson was casually mentioned in the beginning of the evening makes much better sense.

To believe the testimony of Morris Brauer would be in effect saying that Harold Teltser deliberately lied, or was mentally unbalanced, or of such vicious bent as to deliberately destroy a fellow attorney. In view of the testimony before this Court, none of these possibilities exist.

This Court is satisfied that Morris Brauer attempted to induce Harold Teltser, a member of the Bar, to transmit a corrupt proposal to Brendan T. Byrne, Prosecutor for Essex County."

We agree with those views. We add that counsel for Brauer pressed several points before us, none of which in our judgment militates against the conclusion Judge Giuliano reached. It is stressed that the State Police found no evidence of involvement of Brauer with gambling interests. In the nature of the subject, a failure so to find has little meaning. Next it is pointed out that Brauer did not contact Teltser again. This is completely consistent with guilt, for if his effort were fruitful he would expect Teltser to call whereas if it were not, arrangements likely would have been made to record any further conversation. Finally, counsel urges that if Teltser's testimony be accepted, it should be concluded that Brauer spoke only in jest. We see no basis for that hypothesis since Brauer himself denies any such conversation and Teltser had no doubt as to Brauer's serious intent.

■ The remaining question is what discipline should be imposed. Under all the circumstances we believe it appropriate to order a suspension for a period of three years and until the further order of the Court, with the proviso that upon application for reinstatement there will be a full examination into respondent's ethical fitness for the Bar.

## IV

As to the charge against respondents Krieger and Brauer considered in Part I of this opinion, the order to show cause is dismissed. For the reasons given in Part II of this opinion, an order will be entered suspending Krieger for three months. For the reasons given in Part III of this opinion, an order will be entered suspending Brauer for three years and until the further order of this Court.